12 U.S. 456
 8 Cranch 456
 3 L.Ed. 623
 THE GROTIUS, SHEAFE, MASTER.
 March 16, 1814
 
 APPEAL from the sentence of the Circuit Court for the district of Massachusetts.
 The Grotius, an American ship owned by Thomas Sheafe and Charles Coffin, the Claimants, sailed from Portsmouth, New Hampshire, March 2d, 1812, on a voyage, according to the shipping paper, from Portsmouth to one or more southern ports, and from thence to one or more ports in Europe, and back to her port of discharge in the United States, and to Portsmouth, if required. She arrived at New York, and sailed from thence with a cargo for St. Petersburg, and arrived at Cronstadt on the 17th of June, 1812. The cargo was owned by American merchants, and was consigned to a house at St. Petersburg. The consignees furnished a return cargo on the credit of the outward cargo. After the return cargo was put on board, the French armies having entered Russia and threatening to approach St. Petersburg, the consignees were apprehensive that their security for the return cargo might be lost. They arrested the ship and cargo, and would not permit her to depart, but on condition that she should proceed to London with the cargo then on board, and that the captain should sign bills of lading to deliver the property in London to the order of the consignees; they stipulating that if they should have obtained payment from the proceeds of the outward cargo, the bills of lading should be given up to their owners or agents in London, and the cargo then to be at the disposition of the captain.
 The news of the war between the United States and Great Britain having reached St. Petersburg, the American ships in that port, (fifty or sixty in number), with the knowledge and approbation of Mr. Adams, the American minister at the Court of St. Petersburg, sailed for England with British licenses. This was resorted to as the only course in which it was possible to get home. The Grotius sailed, among others, with such license. Owing to the lateness of the season, she put into Carlscrona, Sweden, where she lay from the 28th of November, 1812, until the 25th of March 1813. On the 2d day of May following, she arrived at London, and there discharged her cargo consisting of iron, hemp and cordage, and, on the 17th of June following, departed for the United States, in ballast. On the 29th of July, she was captured by the privateer Frolic, John O'Diorne commander, who put one man on board of her from the privateer. The captain of the Grotias kept his papers and the command of his ship, and navigated her to Boston. On her arrival, she was libelled in the district Court of Massachusetts.
 In this Court a question was made by the Claimants, as to the fact of capture.
 The master, in answer to the 2d interrogatory, swore that he never considered the ship Grotius to have been taken or seized as prize:—that he was present when an armed schooner under English colors met with her, the commander of which represented her to be a British privateer called the Bream, and requested him to take on board a man and treat him as a gentleman until he arrived in the United States, to which he consented.
 Gilman, the mate, in answer to the 2d and 3d interrogatories, stated, that, until his arrival, he never knew that the Grotius had been taken as prize;—that the master had been ordered on board the schooner, and returned with Very, the man who had been taken on board the Grotius.
 Chambers, a seaman, in answer to the 3d interrogatory, stated that the Grotius was met by an armed schooner under English colors which obliged the mate of the ship to go on board her, and afterwards sent him back with a man who, on the next day, declared himself to be put on board as prize-master, saying that if they should fall in with a French vessel, he should be obliged to shew his commission.
 The affidavit of Very, the alleged prize-master, confirms the statement of the mate, that the captain was ordered on board the privateer, and that he, Very, was directed by his commander, in presence of the captain of the Grotius, to go on board as prize-master; but that the master of the ship was to keep possession of the papers, and to navigate her into port.
 In the district Court the ship was condemned to the United States. From this decree the captors and Claimants appealed.
 In the Circuit Court the decree of the district Court was affirmed, pro forma, by consent of parties.
 WEBSTER, for the Claimants, contended,
 1. That, in this case, the ship was not captured, only one man having been put on board. That this case was not affected by the decision in the case of the Alexander. That a capture, as well as the bringing the vessel into port after the capture, must be the effect of power either actual or constructive. That the master of the ship did not know of the intention to capture, nor had he any idea that his vessel was captured, till long after the alleged prize master was put on board. That there was no agreement to consider it as a capture. And, lastly, that there was no bringing in.
 2. That the proceeding to London, under the circumstances of this case, was not such a trading with the enemy as induced a forfeiture of the ship. That it was an act justified by the necessity of the case, there being no other way to get the ship home. That the master was further justified in acting as he did, by the advice of Mr. Adams, the minister at St. Petersburg, where the ship was when the war was first known there. 1 Rob. 184, 220, the Betty Cathcart.
 3. That the ship was not taken in delicto—that there was no trade with the enemy—that the master merely delivered the cargo in London—that the voyage was not to be considered as a continued voyage from the United States to Russia, from Russia to England, and from England to the United States, but merely as a voyage from Russia to London.
 4. That the privateers of the United States had no authority, either under the prize act or their commissions, to capture American vessels found in circumstances like those of the Grotius; that is to say, bound directly to the United States, and within two or three days sail of her destined port. That if she was to be condemned at all, it must be as a droit of admiralty, not as prize to the captors. That privateers claim under a grant from the United States, and must be limited by the express terms of such grant, which ought to have a fair construction, and cannot be supposed to extend to cases where there is no risk, no trouble, no labor on the part of the captors. That the grant is to be considered as a reward for their services. That if a vessel is in port, either voluntarily or by strees of weather, she is no subject of capture.
 PITMAN, contra, for the captors,
 Contended, that the Grotius was liable to condemnation for having sailed from Russia to England with a British license, after knowledge of the war between Great Britain and the United States, and with contraband of war on board;—that the voyage was to be considered as one continued voyage from Russia to the United States;—that the vessel, therefore, if taken at any time before her arrival in the United States and in a place of safety, must be considered as captured in delicto. That the case was analogous to that of a vessel captured while coming out of a blockaded port into which she had proviously slipped by stealth. 1 Rob. 126, 150, the Vrow Judith.—id. 72, 86, the Frederick Molke. That physical force was not necessary to constitute capture; that it had been so decided in the case of the Alexander; and that, if any doubt existed in the mind of the Court with regard to the capture, it was a case for further proof. That the privateers of the United States were authorized to capture even within the jurisdiction of the United States.
 DEXTER, in reply,
 Urged that although the master of the Grotius had heard of the war, he had also heard of the repeal of the orders in council, and that an armistice was about to be agreed upon, if it had not already taken place; that, therefore, it was as if they had not heard of the war at all. That, in order to subject a vessel to condemnation, she must be captured in the prosecution of the voyage in which she was guilty of the offence: that the Grotius was not captured on that voyage: that the voyage from Russia to England was to be considered as a distinct voyage, after the completion of which the vessel was not liable to condemnation for any offence committed on that voyage. That even if the proceeds of the cargo previously deposited in England had been on board at the time of the capture, it would have been no cause of condemnation. That when the cargo was deposited, the offence was deposited with it. Park. 239, Amer. Ed. 1 Rob. 193, 230, the Rebeckah, note. 2 Br. Civ. Law, 58.—id. 250.—id. 262.
 Wednesday, March 26th. Absent. MARSHALL, Ch. J.
 WASHINGTON, J. delivered the opinion of the Court in this case, as follows:
 
 
 1
 This case differs in no material respect from that of the Joseph, just decided, except that in this a question arises as to the validity of the capture. The master of the Grotius, in answer to the second standing interrogatory, swears that he hath never considered the ship to have been taken or seized as prize. That he was present when an armed schooner under English colors met with her, the commander of which represented her to be a British privateer called the Bream, and requested him to take on board a man, and treat him as a gentleman until he arrived in the United States; to which he consented. This testimony of the captain is confirmed by Gilman, the mate, in answer to the 2d and 3d interrogatories, who adds, that Very, the man who was put on board, never conducted as prize master, nor in any other manner than a passenger would, during the voyage. Pierce, one of the seamen, who accompanied the captain on board the schooner, swears that he never knew the ship was seized as prize until after her arrival within the Boston light-house. Chambers, another seaman belonging to the Grotius, in answer to the third interrogatory, says that she was met by an armed schooner under English colors which obliged the mate of the ship to go on board her, and afterwards sent him back with a man who, on the next day, declared himself to be put on board as prize-master, saying that if she should fall in with a French vessel, he should be obliged to show his commission. That he knows not upon what pretence or for what reason she was taken, not knowing, in fact, that she was made prize of, until her arrival at Boston.
 
 
 2
 Daniel J. Very, the alleged prize master, has deposed, on oath, that he was present at the capture of the Grotius by the Frolic; that the captain of the ship was ordered on board the schooner with his papers; and that he, Very, was directed by his commander to go on board as prize master, and this in the presence of the captain of the Grotius; that the master of the ship was to keep possession of the papers, and to navigate her into port. That he accordingly went on board as prize master, carrying with him a copy of the commission of the Frolic; and instructions, in writing, from the commander to him (Very) as prize-master. That the captain of the Grotius informed his crew that in case a British cruizer should board the Grotius, and they should be asked respecting the said Very, they were to answer that he was a passenger.
 
 
 3
 Without giving any opinion as to the regularity of admitting the affidavit of the prize master as a part of the preparatory evidence, the Court is of opinion that the facts necessary for deciding upon the validity of the capture, are not sufficiently clear; and that it will be proper to make an order for further proof, to be furnished by the captors and the Claimants, with respect to all the circumstances of the capture.
 
 
 4
 This point appears not to have been made or considered in the Court below.